**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>and<br><br>THE STATE OF INDIANA,<br><br>Plaintiffs,<br>v.<br><br>SANITARY DISTRICT OF HAMMOND, INDIANA,<br><br>Defendant. | Civil Action No.  2:17-cv-00048<br><br>Judge |

**COMPLAINT**

The United States of America, by authority of the Attorney General of the United States, and acting on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), and the State of Indiana (the "State"), by the authority of its Attorney General and on behalf of the Indiana Department of Environmental Management ("IDEM"), allege as follows:

**NATURE OF ACTION**

1.      This is a civil action brought by the United States and the State pursuant to Clean Water Act ("CWA") § 309(b) and (d), 33 U.S.C. § 1319(b) and (d), seeking injunctive relief and the assessment of civil penalties against the Sanitary District of Hammond, Indiana ("Defendant") for numerous violations of the terms and conditions of the National Pollutant Discharge Elimination System ("NPDES") permits that have been issued to Defendant in accordance with CWA § 402(b), 33 U.S.C. § 1342(b), and the regulations adopted thereunder, and Title 13 of the Indiana Code, and 327 Ind. Admin. Code 5-2-2; and for failing to respond to an information request issued to the

1

Defendant by EPA pursuant to CWA § 308, 42 U.S.C. § 1318. For many years, Defendant has illegally discharged pollutants from its sewage collection systems and wastewater treatment plant to the Grand Calumet and Little Calumet Rivers.

## JURISDICTION, VENUE, AUTHORITY, AND NOTICE

2.      This Court has jurisdiction over the subject matter of this action under CWA § 309(b), 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1331, 1345, and 1355. The State is a party to this action under CWA §309(e), 33 U.S.C. § 1319(e), and 28 U.S.C. § 1367(a).

3.      This Court has supplemental jurisdiction over the State law claims alleged here under 28 U.S.C. § 1367(a), because the State claims are related to the federal claims and form part of the same case or controversy.

4.      Venue is proper in the Northern District of Indiana under 28 U.S.C. § 1391(b) and CWA §§ 309(b), 33 U.S.C. § 1319(b), because it is the judicial district where Defendant is located and where the alleged violations occurred. Venue in this District is also proper under 28 U.S.C. § 1367(a).

5.      As a signatory to this Complaint, the State has actual notice of the commencement of this action in accordance with CWA §309(b), 33 U.S.C. § 1319(b).

6.      The Attorney General of the United States is authorized to appear and represent the United States in this action under CWA § 506, 33 U.S.C. § 1366, and 28 U.S.C. §§ 516 and 519.

7.      The Indiana Attorney General is authorized to appear and represent the State in this action under Ind. Code §§ 4-6-3-2(a), 13-30-4-1, and 13-14-2-6.

## THE PARTIES

8.      Plaintiff United States is acting at the request and on behalf of the Administrator of EPA. Plaintiff the State of Indiana is acting at the request and on behalf of the Commissioner of IDEM. Plaintiff the State of Indiana is a "State" and "person" within the meaning of CWA § 502(4) and (5), 33 U.S.C. § 1362(4) and (5).

9.      The CWA requires that a state be joined as a party when the United States sues a municipality of the state. CWA § 309(e), 33 U.S.C. § 1319(e). In this action, the State is a co-Plaintiff with the United States. IDEM is authorized to implement the CWA within the State. Ind. Code § 13-13-5-1(1). Indiana regulations incorporate the CWA, 33 U.S.C. § 1251 *et seq*., by reference. 327 Ind. Admin. Code 5-2-1.5(1).

10.     Defendant is a political subdivision of the State. Defendant owns and operates a wastewater collection system and a wastewater treatment plant ("WWTP") in the City of Hammond, Indiana, and operates certain sewage and storm water collection facilities in the Town of Munster, Indiana. Defendant's sewage and storm water collection system and the WWTP serve the City of Hammond, the Town of Munster, the customer municipalities of Griffith, Highland, and Whiting, and numerous industrial users.

11.     Defendant is a "municipality" and a "person" within the meaning of CWA § 502(4) and (5), 33 U.S.C. § 1362(4) and (5).

## GOVERNING LAW

12.     The objective of the CWA is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. 33 U.S.C. § 1251.

13.     To promote the objective of the CWA, the CWA and Indiana Code prohibit the "discharge of any pollutants" by any person except, among other things, in compliance with a NPDES permit issued by an authorized state under CWA § 402(b), 33 U.S.C. § 1342(b). CWA § 301(a), 33 U.S.C. § 1311(a); Ind. Code § 13-30-2.

14.     The CWA defines "discharge of a pollutant" to mean, among other things, "any addition of any pollutant to navigable waters from any point source." CWA § 502(12), 33 U.S.C. § 1362(12). *See also* 327 Ind. Admin. Code 5-1.5-11 (similarly defining "discharge of a pollutant").

15.     The CWA and Indiana regulations define "pollutant" to include sewage. CWA § 502(6), 33 U.S.C. § 1362(6); 327 Ind. Admin. Code 5-1.5-41.

16.     Under the CWA and Indiana regulations, a "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, or tunnel…from which pollutants are or may be discharged." CWA § 502(14), 33 U.S.C. § 1362(14); 327 Ind. Admin. Code 5-1.5-40.

17.     The CWA defines "navigable waters" as "the waters of the United States, including the territorial seas." CWA § 502(7), 33 U.S.C. § 1362(7). "Waters of the United States" have been further defined to include, among other things, waters that are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, interstate waters, tributaries of such waters, and wetlands adjacent to the foregoing waters. 40 C.F.R. § 122.2.

18.     Indiana law defines "waters of the state" to include "the accumulations of water, surface and underground, natural and artificial, public and private; or a part of the accumulations of water that are wholly or partially within, flow through, or border upon Indiana."  Ind. Code. § 13-11-2-265.

19.     EPA may issue to a "person" a NPDES permit that authorizes the discharge of any pollutant to navigable waters, but only in compliance with the applicable requirements of CWA § 301, 33 U.S.C. § 1311, and the terms and conditions EPA determines are necessary to carry out the provisions of the CWA. CWA § 402(a), 33 U.S.C. § 1342(a).

20.     A state, like the co-Plaintiff State here, may establish and administer its own permit program, and, after EPA authorizes its program, may issue NPDES permits. CWA § 402(b), 33 U.S.C. § 1342(b).

21.     At all times relevant to this Complaint, IDEM has been, and continues to be, authorized by EPA to administer a NPDES permit program for regulating discharges of pollutants into navigable waters within Indiana under CWA § 402(b), 33 U.S.C. § 1342(b). 40 Fed. Reg. 4,033 (Jan. 27, 1975).

22.     IDEM administers the NPDES permitting program in Indiana under Ind. Code § 13-13-5-1(1) and maintains concurrent enforcement authority with EPA over NPDES permits in Indiana. Indiana law prohibits the discharge of pollutants to "waters of the state" except as authorized by a duly issued NPDES permit. 327 Ind. Admin. Code 5-2-2.

23.     Each permit, order, or decree issued under the CWA after December 21, 2000 for a discharge from a municipal combined storm and sanitary sewer must conform to EPA's Combined Sewer Overflow Control Policy ("CSO Control Policy") found at 59 Fed. Reg. 18,688 (April 19, 1994). CWA § 402(q), 33 U.S.C. § 1342(q).

24.     EPA's CSO Control Policy requires owners or operators of combined sewer overflow ("CSO") outfalls to develop a Long Term Control Plan to minimize discharges of untreated sewage from CSO outfalls.

25.     The CWA also authorizes the EPA Administrator to require the owner or operator of any point source to (i) establish and maintain such records; (ii) make such reports; (iii) install, use, and maintain monitoring equipment or methods; (v) sample such effluents, and (v) provide such other information as required whenever necessary to carry out the objectives of the CWA, including by not limited to the requirements of CWA § 402, 33 U.S.C. § 1342.

26.     The CWA further provides that EPA is authorized to commence a civil action for appropriate relief, including a permanent or temporary injunction, when any person violates CWA § 301, 33 U.S.C. § 1311, CWA § 308, 33 U.S.C. § 1318, or the terms or conditions of a NPDES permit. CWA § 309(b), 33 U.S.C. § 1319(b). Indiana is authorized to enforce its water pollution control laws under Ind. Code §§ 13-30-1-1, 13-30-3, or 13-14-1-12.

27.     Any person who violates CWA § 301, 33 U.S.C. § 1311, CWA § 308, 33 U.S.C. § 1318, or who violates any condition or limitation of a NPDES permit issued pursuant to CWA § 402, 33 U.S.C. § 1342, is subject to a civil penalty not to exceed $25,000 per day of violation, as adjusted for inflation, with each day in which a violation occurs constituting a separate violation. CWA § 309(d), 33 U.S.C. § 1319(d).

28.     Under the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996 and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note: Pub. L.114-74, § 701, CWA statutory penalties have been adjusted for inflation through 40 C.F.R. § 19.4. Pursuant to this rule, the applicable civil penalty levels have increased to $37,500 per day for each violation occurring after January 12, 2009 through November 1, 2015. Further, under the Federal Civil Penalties Inflation Adjustment Act of 2015, the maximum civil penalty is $51,570 per day for each violation occurring after November 1, 2015. *Id.*

29.     The State is authorized to commence a civil action for appropriate relief to address violations of Title 327 of the Indiana Administrative Code, Article 5, including injunctive relief and civil penalties. 327 Ind. Admin. Code 5-2-20 and Ind. Code §§ 13-30-4-1 and 13-14-2-6. This relief may include a permanent or temporary injunction, as well as a civil penalty of up to $25,000 per day for each violation.

## GENERAL ALLEGATIONS

### Defendant

30.     Defendant owns and operates a "treatment works" and a "publicly owned treatment works" ("POTW") as those terms are defined in EPA's regulations implementing the CWA. CWA § 212(2), 33 U.S.C. § 1292(2); 40 C.F.R. § 122.2 (cross-referencing the definition at 40 C.F.R. § 403.3). Defendant's POTW consists of a wastewater treatment plant ("WWTP") and the sewage collection system for this plant.

31.     Defendant's POTW collects, conveys, treats, and disposes of sanitary sewage from the City of Hammond and the Town of Munster, as well as three customer communities and various industrial users, comprising a service population of approximately 150,000 people.

32.     The WWTP has an average peak design flow of 68 million gallons of effluent per day.

33.     Defendant owns and operates a collection system that consists of approximately 274 miles of pipe that convey sewage and other pollutants to the WWTP. The collection system includes "combined sewers" (*i.e.*, pipes that carry both sewage and storm water in the same pipe) and "sanitary sewers" (*i.e.*, pipes that carry only sewage).

34.     Defendant's POTW is a "point source" as that term is defined in CWA § 502(14), 33 U.S.C. § 1362(14); 327 Ind. Admin. Code 5-1.5-40.

35.    The wastewater that Defendant conveys and/or stores in its collection system, and the wastewater that Defendant treats and disposes of at its WWTP, contain "pollutants" as that term is defined in the CWA. CWA § 502(6), 33 U.S.C. § 1362(6); 327 Ind. Admin. Code 5-1.5-41.

**Defendant's NPDES Permits**

36.    On or about June 13, 2006, IDEM issued to Defendant, NPDES Permit No. IN0023060 (the "2006 NPDES Permit"), as authorized under CWA § 402, 33 U.S.C. § 1342, and Ind. Code § 13-13-5-1(1). The 2006 NPDES Permit became effective on July 1, 2006, and superseded Defendant's previous NPDES permit, and was in effect through April 30, 2012.

37.    On or about April 18, 2012, IDEM issued to Defendant NPDES Permit No. IN0023060 (the "2012 NPDES Permit"). The 2012 NPDES Permit became effective on May 1, 2012, and superseded Defendant's 2006 NPDES Permit. The 2012 NPDES Permit was amended, effective March 1, 2013 ("2013 NPDES Permit Amendments"), to increase the daily maximum loading and concentration limitations for ammonia-nitrogen in both the summer and winter months. The 2012 NPDES Permit, as amended by the 2013 NPDES Permit Amendments, will be effective through April 30, 2017.[1]

38.    The 2006 NPDES Permit authorized, and the 2012 NPDES Permit authorizes, the discharge of effluent from Defendant's WWTP and collection system only in compliance with the conditions and limitations set forth in those Permits.

39.    The 2006 NPDES Permit authorized, and the 2012 NPDES Permit authorizes, discharges from a single, designated outfall at the WWTP, "Outfall 001," to the Grand Calumet

---

[1]  In 2015, IDEM approved HSD's request to again amend its 2012 NPDES Permit to reflect the removal of two CSO Outfalls and the changed status of another CSO outfall. However, the 2015 amendment is not directly relevant here. This Complaint uses the term "2012 NPDES Permit" when referring to the broader NPDES Permit that succeeded the 2006 NPDES Permit. The Complaint uses the term "2013 NPDES Permit Amendments" only when referring to ammonia-nitrogen claims occurring after the 2013 amendments to the NPDES Permit were effective.

River, and from CSO Outfalls listed in Appendix A of the NPDES Permits, subject to the limitations in Part I.A. of those Permits.

40.    Both the 2006 NPDES Permit and the 2012 NPDES Permit contain influent (flow coming into the WWTP) monitoring requirements for mercury and required Defendant to monitor its influent on a prescribed bi-monthly basis, including in February and August of each year, using a prescribed method set forth in those Permits. 2006 NPDES Permit, Part I.A.4 and Part I.E; 2012 NPDES Permit, Part I.A.4.

41.    The 2012 NPDES Permit contains effluent (flow exiting the WWTP) monitoring requirements for mercury and required Defendant to sample its effluent from Outfall 001 in the manner and within the time frames required in its 2012 NPDES Permit. 2012 NPDES Permit, Part I.A.3.

42.    Once in water or on land, mercury frequently converts to methylmercury, which is a well-known neurotoxin. Methylmercury bio-accumulates along aquatic and terrestrial food chains, where the concentrations increase exponentially. The exposure of people and some wildlife to mercury is largely through consumption of fish containing elevated concentrations of mercury. Thirty-three states, including Indiana, have fish consumption advisories because of mercury contamination.

43.    The 2006 NPDES Permit provides that for Outfall 001, the final monthly average concentration (quality) effluent limit for total residual chlorine was 0.008 milligrams/liter ("mg/l"), with samples required to be taken daily. 2006 NPDES Permit, Part I.A.1.

44.    The 2012 NPDES Permit provides that for Outfall 001, the final monthly average concentration (quality) effluent limit for total residual chlorine is 0.008 mg/l, and the final monthly

average loading (quantity) effluent limit for total residual chlorine is 4.5 pounds per day

("lbs./day"). 2012 NPDES Permit, Part I.A.1.

45.     The 2012 NPDES Permit also restricts the discharge of total residual chlorine from

Outfall 001 on a daily basis. The final daily maximum concentration (quality) effluent limit is 0.06

mg/l and the final daily maximum loading (quantity) effluent limit is 34 lbs./day. 2012 NDPES

Permit, Part I.A.1.

46.     Even though chlorine is used to disinfect waste water prior to it being discharged to a

waterway, excessive chlorine is toxic to aquatic life and can sterilize a water body, leading to rapid

mortality of fish and other animals. Therefore owners and operators of a POTW are required to

remove chlorine from treated wastewater prior to discharging it.

47.     The 2006 NPDES Permit provides that for Outfall 001, the weekly average loading

(quantity) effluent limit for total suspended solids ("TSS"), in the winter season (October 1 through

June 30 annually) was 7,263 lbs./day and the weekly average concentration (quality) effluent limit

for TSS was 12.8 mg/l, each requiring that samples be taken daily. 2006 NPDES Permit, Part I.A.1.

48.     High concentrations of suspended solids, which can include materials such as silt,

decaying plant and animal matter, industrial wastes and sewage, can cause significant problems for

stream health and aquatic life. Excessive suspended solids in a water body increases the turbidity, or

cloudiness, of the water. When a water body experiences high turbidity, there is less sunlight

available for aquatic vegetation, algae and mosses to grow by photosynthesis, which reduces the

plant matter available to support the food chain and habitat of snails, insects, and juvenile fish.

Additionally, as more plant life dies, their decomposition uses even more oxygen, further reducing

the availability of oxygen for other plants and animals. Turbidity also interferes with the ability of

insects and fish predators to visually find their prey, and it impairs reproduction when visual cues are part of an animal's courtship and mating rituals.

49.     Both the 2006 and the 2012 NPDES Permit provide that for Outfall 001, the maximum daily concentration (or quality) effluent limit for ammonia as nitrogen, in the winter (October 1 through June 30), is 2.95 mg/l, with samples required to be taken five times weekly. 2006 NPDES Permit, Part I.A.1; 2012 NPDES Permit, Part I.A.1.

50.     Both the 2012 NPDES Permit and the 2013 NPDES Permit Amendments provide that for Outfall 001, the monthly average concentration (or quality) effluent limit for ammonia as nitrogen, in the winter (October 1 through June 30), is 1.27 mg/l, with samples required to be taken five times weekly. 2012 NPDES Permit, Part I.A.1; Amended 2012 NPDES Permit, Part I.A.1.

51.     The 2013 NPDES Permit Amendments provide that for Outfall 001, the maximum daily concentration (or quality) effluent limit for ammonia as nitrogen, in the winter (October 1 through June 30), is 3.5 mg/l, with samples required to be taken five times weekly. 2013 NPDES Permit Amendments, Part I.A.1.

52.     The Amended 2012 NPDES Permit provides that for Outfall 001, the maximum daily concentration (or quality) effluent limit for ammonia as nitrogen, in the summer (July 1 through September 30), is 3.4 mg/l, with samples required to be taken five times weekly. 2013 NPDES Permit Amendments, Part I.A.1.

53.     Ammonia breaks down into its chemical components, including nitrogen. Excess nitrogen can cause overstimulation of growth to aquatic plants and algae. Excessive growth of these organisms can lead to eutrophication and dissolved oxygen depletion in water bodies, which occurs when the decomposition of plants and algae consume dissolved oxygen in the water. Eutrophication produces unsightly scums of algae on the water surface and deprivation of oxygen for other

organisms like fish and amphibians. Without sufficient light and oxygen, plant and animal

populations experience reduced growth rates, reduced reproductive success, decreased population

size, and increased mortality, among other harmful effects.

54.     The State has designated the Grand Calumet River and the Little Calumet River as

"full-body contact recreation" waters during the recreational season, which extends from April 1 to

October 31 annually.

55.     Under Indiana law, a water body that has been designated a full-body contact

recreation water is in violation of water quality standards for the bacterium *Escherichia coli*

bacteria, commonly referred to as *E. coli,* when either (i) any one sample of water in a 30-day

period exceeds 235 colonies of *E. coli* per 100 milliliters ("ml") of water collected when fewer than

ten samples are collected during that 30-day period, or (ii) more than 10% of samples exceed 235

colonies of *E. coli* per 100 ml of water collected when ten or more samples are collected during the

30-day period. 327 Ind. Admin. Code 2-1.5-8(e). This standard is incorporated into Defendant's

2006 NPDES Permit and 2012 NPDES Permit, and thus is enforceable by both the United States

and the State. 2006 NPDES Permit, Part I.A.1; 2012 NPDES Permit, Part I.A.1.

56.     The 2006 NPDES Permit provided that for Outfall 001, from April 1 through

October 31 annually, the daily maximum concentration (quality) effluent limit for *E. coli* was 235

colonies/100 ml of water sampled, and the monthly average concentration (or quality) effluent limit

for *E. coli* was 125 colonies/100 ml f water sampled, with samples required to be taken once daily.

2006 NPDES Permit, Part I.A.1.

57.     Untreated sewage contains organic matter, bacteria (like *E. coli*) and other potential

pathogens, and other pollutants that can be harmful to human health, aquatic life, and the

environment. The pathogens in raw sewage can cause a number of diseases in humans, including

but not limited to enteric diseases such as gastroenteritis, dysentery, and cholera. In Defendant's 2006 NPDES Permit and 2012 NPDES Permit, the effluent limits for *E. coli* serve as surrogates to restrict the concentrations of many types of bacteria and pathogens whose presence tend to be correlated with *E. coli*.

58.     The 2006 NPDES Permit provided that for Outfall 001, the monthly average loading (or quantity) effluent limit for chloride was 59,407 lbs./day, and the monthly average concentration (or quality) effluent limit for chloride was 188 mg/l, each requiring samples to be taken once weekly. 2006 NPDES Permit, Part I.A.3.

59.     The 2012 NPDES Permit provides that for Outfall 001, the monthly average loading (or quantity) effluent limit for chloride is 59,000 lbs./day, with samples required to be taken once weekly. 2012 NPDES Permit, Part I.A.3.

60.     High levels of chloride concentrations have been shown to be harmful to aquatic life and the environment. The adverse effects of excessive levels of chloride on freshwater aquatic plant and animal life include interference with survival, growth, and reproduction.

61.     The 2006 NPDES Permit required, and the 2012 NPDES Permit and the 2013 NPDES Permit Amendments require, Defendant to submit to IDEM its effluent sampling results – like those for TSS, ammonia as nitrogen, *E. coli*, chloride and residual chlorine – on a prescribed monthly basis using a Discharge Monitoring Report ("DMR") and a Monthly Report of Operation ("MRO"). 2006 NPDES Permit, Part I.B.2 and I.B.3; 2012 NPDES Permit, Part I.B.2 and I.B.3; 2013 NPDES Permit Amendments, Part I.B.2 and I.B.3.

62.     The 2006 NPDES Permit required, and the 2012 NPDES Permit and the 2013 NPDES Permit Amendments require, Defendant to submit to IDEM on a prescribed monthly basis

13

all instances of combined sewer overflow discharges on a CSO DMR. 2006 NPDES Permit, Part I.B.3; 2012 NPDES Permit, Part I.B.3; 2013 NPDES Permit Amendments, Part I.B.3.

63.     The 2006 NPDES Permit authorized, and the 2012 NPDES Permit authorizes, Defendant to discharge from as many as eighteen CSO outfalls during wet weather, subject to the requirements and limitations of those Permits. Attachment A, Part I.A, of 2006 NPDES Permit; Attachment A, Part I.A, of 2012 NPDES Permit.

64.     The 2006 NPDES Permit provided, and the 2012 NPDES Permit provides, that the discharge from any and all CSO outfalls shall not cause receiving waters to contain substances, materials, floating debris, or other pollutants in amounts sufficient to be unsightly or deleterious. Attachment A, Part I.B, of 2006 NPDES Permit; Attachment A, Part I.B, of 2012 NPDES Permit.

65.     IDEM interprets "deleterious" to include any discharges that cause or contribute to violations of applicable water quality standards or cause or contribute to the impairment of a designated or existing use of the receiving stream.

**FIRST CLAIM FOR RELIEF**
(Combined Sewer Overflows that Contributed to Deleterious Conditions)

66.     Paragraphs 1 through 65 are re-alleged and incorporated herein by reference.

67.     On at least 3,405 occasions from June 1, 2009, through the present, Defendant discharged pollutants, including but not limited to untreated sewage, from some or all of the eighteen designated CSO outfalls specified in Defendant's 2006 NPDES Permit and 2012 NPDES Permit. Defendant violated the terms and conditions of its 2006 NPDES Permit and 2012 NPDES Permit, including the General Effluent Limitations portion set forth in Part I.B of Attachment A of each Permit, because these discharges caused receiving waters to contain substances, materials, floating debris, or other pollutants that are in amounts sufficient to be unsightly or deleterious.

68.     Each discharge occurring at each designated CSO outfall that violated the terms and conditions of Part I.B of Attachment A of the 2006 NPDES Permit, or Part I.B of Attachment A of the 2012 NPDES Permit, constitutes a separate violation of the CWA. 33 U.S.C. § 1319(d).

69.     Each such discharge constitutes a separate violation of Ind. Code § 13-30-2-1 and 327 Ind. Admin. Code 5-2-2.

70.     Unless enjoined by the Court, the Defendant will continue to violate the CWA and the terms of the 2012 NPDES Permit and Ind. Code § 13-30-2-1 and 327 Ind. Admin. Code 5-2-2.

71.     For each violation referred to in this claim, pursuant to CWA § 309(b) and (d), 33 U.S.C. § 1319(b) and (d), Defendant is subject to injunctive relief, as well as civil penalties in the amounts as set forth in Paragraphs 26-29 of this Complaint.

## SECOND CLAIM FOR RELIEF
(Exceedances of NPDES Permit Effluent Limitations for Chlorine,
Total Suspended Solids, Ammonia, *E. coli*, and Chloride)

72.     Paragraphs 1 through 65 are re-alleged and incorporated herein by reference.

73.     Defendant is required to comply with the requirements of its 2006 NPDES Permit and its 2012 NPDES Permit. Defendant violated several of those requirements, including:

a.     on at least six occasions since June 1, 2009, as it reported on its DMRs, Defendant has discharged chlorine from Outfall 001 in amounts that exceeded the effluent limitations for monthly average concentration, monthly loading, daily maximum concentration, and/or daily maximum loading for total residual chlorine that were contained in Part I.A.1 of its 2006 NPDES Permit;

b.     on at least two occasions since June 1, 2009, as it reported on its DMRs, Defendant has discharged TSS from Outfall 001 in amounts that exceeded the winter season weekly

15

average concentration and/or the weekly average loading effluent limitation for TSS contained in Part I.A.1 of its 2006 NPDES Permit;

        c.      on at least eight occasions since June 1, 2009, as it reported on its DMRs, Defendant has discharged ammonia (as nitrogen) from Outfall 001 in amounts that exceeded the daily maximum concentration and/or the monthly average concentration effluent limitations for ammonia contained in Part I.A.1 of its 2006 NPDES Permit, its 2012 NPDES Permit, and/or its Amended 2012 NPDES Permit;

        d.      on at least one occasion since June 1, 2009, as it reported on its DMRs, Defendant discharged *E. coli* from Outfall 001 in amounts that exceeded the monthly average concentration and/or the daily maximum effluent limitations for *E. coli* contained in Part I.A.1 of its 2006 NPDES Permit; and

        e.      on at least 22 occasions since June 1, 2009, as it reported on its DMRs, Defendant has discharged chloride from Outfall 001 in amounts that exceeded the monthly average loading and/or the monthly average concentration effluent limitations for chloride contained in Part I.A.3 of its 2006 NPDES Permit and/or Part I.A.3 of its 2012 NPDES Permit.

        74.      For each instance where Defendant's discharges from Outfall 001 exceeded the effluent limitations for:  (a) total residual chlorine contained in Part I.A.1 of its 2006 NPDES Permit; (b) TSS contained in Part I.A.1 of its 2006 NPDES Permit; (c) ammonia (as nitrogen) contained in Part I.A.1 of its 2012 NPDES Permit and Part I.A.1 of its Amended 2012 NPDES Permit; (d) *E. coli* contained in Part I.A.1 of its 2006 NPDES Permit; and (e) chloride contained in Part I.A.3 of its 2006 NPDES Permit and Part I.A.3 of its 2012 NPDES Permit, Defendant is in violation of the CWA, 33 U.S.C. § 1319(d). Each day of the averaging period for each instance of exceedance constitutes a separate violation.

75.     Each such discharge also constitutes a separate violation of Ind. Code § 13-30-2-1 and 327 Ind. Admin. Code 5-2-2. Each day of the averaging period for each instance of exceedance constitutes a separate violation.

76.     Unless enjoined by the Court, Defendant will continue to violate the CWA and the terms of the 2012 NPDES Permit and Ind. Code § 13-30-2-1.

77.     For each violation referred to in this claim, pursuant to CWA § 309(b) and (d), 33 U.S.C. § 1319(b) and (d), Defendant is subject to injunctive relief, as well as civil penalties in the amounts as set forth in paragraphs 26-29 of this Complaint.

78.     For each violation in this claim that occurred prior to April 13, 2011, through a Motion for Judicial Assessment of Stipulated Penalties in a separate civil action in this District Court, 2:93-cv-225 (J. Moody) (Doc. 548), the United States and State of Indiana currently seek stipulated penalties against the Defendant pursuant to the June 17, 1999, consent decree entered into by the Parties and signed by this Court. Consistent with the 1999 consent decree, any stipulated penalties assessed by the Plaintiffs and paid by Defendant for a violation would be set-off against any civil penalty awarded for that same violation in this action.

### THIRD CLAIM FOR RELIEF
(Failure to Monitor and Sample Mercury as Required by NPDES Permits)

79.      Paragraphs 1 through 65 are re-alleged and incorporated herein by reference.

80.     On at least two occasions since June 1, 2009, Defendant HSD failed to monitor its influent to its WWTP in the manner required in its 2006 NPDES Permit and its 2012 NPDES Permit. 2006 NPDES Permit, Part I.A.4 and Part I.E; 2012 NPDES Permit, Part I.A.4.

81.     On at least four occasions since June 1, 2009, Defendant HSD failed to sample its effluent from its WWTP in the manner and within the time frames required in its 2012 NPDES Permit. 2012 NPDES Permit, Part I.A.4 and Part I.E.

82.    For each instance of failing to monitor or sample mercury as prescribed under its 2006 NPDES Permit and 2012 NPDES Permit, Defendant HSD violated the terms and conditions of Part I.A.4 of its 2006 NPDES Permit and Part I.A.4 of its 2012 NPDES Permit. Each day of the averaging period for each instance of exceedance constitutes a separate violation.

83.    For each violation referred to in this claim, pursuant to CWA § 309(b) and (d), 33 U.S.C. § 1319(b) and (d), Defendant HSD is subject to injunctive relief, as well as civil penalties in the amounts as set forth in Paragraphs 26-29 of this Complaint.

## FOURTH CLAIM FOR RELIEF
### (Failure to Respond to EPA's CWA Information Request)

84.    Paragraphs 1 through 65 are re-alleged and incorporated herein by reference.

85.    On February 22, 2012, EPA sent Defendant an information request pursuant to CWA § 308(a), 33 U.S.C. § 1318, which included a request that Defendant develop and submit technical information required by a Long Term Control Plan ("LTCP") to address its CSO discharges.

86.    Defendant failed to provide all of the information required by EPA's February 22, 2012, information request.

87.    An LTCP is a "report" or "information" as described in CWA § 308(a), 33 U.S.C. § 1318(a).

88.    EPA required Defendant's LTCP in order to carry out the provisions of CWA § 402(q), 33 U.S.C. § 1342(q), and the objectives of the CWA.

89.    Defendant's failure to respond to the February 22, 2012, information request is a violation of CWA § 308(a), 33 U.S.C. § 1318(a).

90.    For the violation in this claim, pursuant to CWA § 309(b) and (d), 33 U.S.C. § 1319(b) and (d), Defendant is subject to injunctive relief, as well as civil penalties in the amounts as set forth in paragraphs 26-28 of this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, the United States and the State, respectfully pray that this Court provide the following relief:

1.       A permanent injunction directing Defendant to take all steps necessary, including development and implementation of a Long Term Control Plan as provided for in EPA's CSO Control Policy, to come into permanent and continuous compliance with all terms and conditions of its 2012 NPDES Permit, as amended, and with the CWA, including but not limited to the conditions in its 2012 NPDES Permit, as amended, prohibiting wet weather discharges of pollutants from CSO outfalls except as authorized by its 2012 NPDES Permit, as amended; and

2.       A permanent injunction directing Defendant to take all steps necessary to: (a) identify the cause of the exceedances of the effluent limitations for chlorine, total suspended solids, ammonia, *E. coli*, and chloride contained in Defendant's 2006 NPDES Permit and 2012 NPDES Permit, as amended; (b) develop and implement a remedy to prevent future exceedances of those effluent limitations; and (c) develop and implement a remedy to ensure mercury is monitored and sampled as required by the 2012 NPDES Permit, as amended;

3.       A judgment assessing civil penalties against Defendant and in favor of the United States, not to exceed $37,500 per day for each separate violation of the CWA that occurred after January 12, 2009 or $51,570 per day for each separate violation of the CWA that occurred after November 2, 2015;

4.       A judgment assessing civil penalties against Defendant and in favor of the State, not to exceed $25,000 per day for each separate violation of Ind. Code § 13-18-4-5 that occurred;

5.       Award the United States and the State their respective costs and disbursements in this action; and

6.    Grant such other relief as this Court deems appropriate.

Respectfully submitted,

FOR THE UNITED STATES OF
AMERICA

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources
Division

JENNIFER A. LUKAS-JACKSON
Senior Attorney
ALISON C. McGREGOR
Trial Attorney
U.S. Department of Justice
Environmental Enforcement Section
P.O. Box 7611
Washington, DC 20044
Tel. (202) 305-2332
Fax. (202) 514-0097
jennifer.lukas-jackson@usdoj.gov

DAVID A. CAPP
United States Attorney
Northern District of Indiana

SHARON JEFFERSON
Assistant United States Attorney
Northern District of Indiana
5400 Federal Plaza, Ste. 1500
Hammond, IN 46320
Tel.:  (219) 937-5681
sharon.jefferson2@usdoj.gov

20

OF COUNSEL:

NICOLE CANTELLO
Associate Regional Counsel
U.S. EPA Region 5
77 West Jackson Blvd.
Chicago, IL 60604
Tel.: (312) 353-3114

SUSHILA NANDA
Attorney Advisor
U.S. EPA Headquarters
Ariel Rios Building (2243A)
1200 Pennsylvania Ave., NW
Washington, DC 20460
Tel.: (202) 564-4026

FOR THE STATE OF INDIANA

CURTIS T. HILL, Jr.
Indiana Attorney General


SARA T. MARTIN
Deputy Attorney General
302 West Washington Street
Indianapolis, IN 46204
(317) 232-5921


OF COUNSEL:

ELIZABETH ADMIRE
Office of General Counsel
Indiana Department of Environmental Management